UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ERIC SCOTT CHAPMAN,

                  Petitioner,                    Case No. 1:12-cv-543

v.                                     Honorable Robert Holmes Bell

KENNETH T. McKEE,

                  Respondent.

_____/

## OPINION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner is serving a term of 16 to 30 years, imposed by the Calhoun County Circuit Court on May 18, 2009, after a Petitioner pleaded guilty to assault with intent to murder, MICH. COMP. LAWS § 750.83.  In his *pro se* petition, Petitioner raises the following ground for habeas corpus relief:

> Trial counsel was constitutionally ineffective in failing to provide adequate and correct advice on possible sentencing upon a guilty plea and erroneously told the Petitioner that the companion case would be dismissed if he pled guilty to the charge.

(Pet. 12(a), docket #1, Page ID#5.)  Respondent has filed an answer to the petition (docket #8).  Upon review and applying the AEDPA standards, I find that Petitioner's claim is without merit, and, thus, the petition will be denied.

## Procedural History

### A.    Trial Court Proceedings

Petitioner was charged with assault with intent to commit murder arising from an incident that occurred in Calhoun County on August 21, 2008.  The preliminary examination was held on October 1, 2008.  Laurie Ann Fisher testified that when she came home from work on the evening of August 21, 2008, her fiance, Todd Chapman, and his brother, Eric Chapman (Petitioner) were sitting in chairs in front of the barn.  (Preliminary Examination Transcript (PE Tr.) 5, docket #11).  Petitioner came into the house a few minutes later.  He yelled at Fisher that he and his family hated her, and then began strangling her.  (*Id*. 6.)  Petitioner told Fisher that he was going to kill her and continued to repeatedly punch and kick Fisher all over her head and body.  (*Id*.)  Each time Fisher hit the ground, she tried to get up and begged Petitioner to stop.  (*Id*.)  Petitioner pursued Fisher through the house and continued to beat and strangle her.  Eventually, Fisher was able to get out the door and ran across the yard screaming for help.  (*Id*. at 7-8.)  Petitioner followed her to the barn and began hitting her in the head with a floor jack.  (*Id*. at 9.)  Todd Chapman came up the stairs from the lower level of the barn and ordered Petitioner to stop.  (*Id*. at 8.)  Petitioner and Todd went outside the barn and Fisher could hear Petitioner say, "Either you finish her off or I am."  (*Id*. at 11.)  Petitioner got into his vehicle and drove away.  (*Id*.)  Fisher went to Oaklawn Hospital, but was later transported to Bronson Hospital in Kalamazoo.  (*Id*. at 13.)  She was treated for broken ribs, a collapsed lung, two broken bones in her back, a skull fracture and numerous bruises and abrasions, some of which required stitches.  (*Id*.)

Todd Chapman testified that while he and Petitioner were sitting outside the barn, Petitioner asked Todd if he loved Fisher.  (PE Tr. 17.)  Todd responded that they had some problems

and he did not love her as much as he used to.  Todd continued that he had told Fisher that if she wanted to leave, she could go anytime she wanted.  (*Id*.)  Petitioner got up and left.  Todd thought that Petitioner was going over to their Mom's house and Todd went back into the barn to work on some equipment in the basement.  (*Id*.)  The next thing he heard was Fisher screaming for him and yelling, "Your brother's trying to kill me.  (*Id.* at 18.)  When Todd got to the top of the basement stairs, he could see Petitioner hitting Fisher with a jack.  (*Id*.)  Todd got between the two of them and told Petitioner to get out.  (*Id*.)  Petitioner said that he was going to kill Fisher, but Todd eventually diffused the situation and Petitioner left.  (*Id*. at 19.)  Fisher initially said that she was not going to press charges and went to her mother's house.  (*Id*.)  However, later that evening, they decided that she needed medical attention and took her to the hospital.  (*Id*.)

At the conclusion of the preliminary examination, the trial court bound Petitioner over on the charge of assault with intent to commit murder.  (PE Tr. 21-22.)[1]

A competency and plea hearing was held on April 21, 2009.  Upon order of the trial court, Petitioner underwent a forensic psychological examination to determine whether he was competent to stand trial.  (Competency and Plea Hearing (Plea Tr.) 3-4, docket #12.)  The examiner concluded that Petitioner understood the nature of the proceedings against him and was able to assist in his defense in a rational matter, and, thus, recommended that Petitioner be found competent to stand trial.  (*Id*. at 5-6.)  The attorneys did not offer any further argument on the issue of competency.  (*Id*. at 6.)  Consequently, the trial court found Petitioner competent to stand trial.  (*Id*.)  Immediately

---

[1]Petitioner was charged in a separate criminal case in Calhoun County with various felonies offenses that were committed against Petitioner's brother, Todd Chapman, while Petitioner was out on bond for the offense charged in this case.

thereafter, Petitioner pleaded guilty to the charged offense assault with intent to commit murder. (*Id.* at 7-16.)

After he was placed under oath, Petitioner stated that he understood the charge against him and that it was punishable by a maximum sentence of any number of years up to life imprisonment. (Plea Tr. 7.) Petitioner stated that he understood the rights he was giving up by pleading guilty. (*Id.* at 8-9.) Petitioner further agreed that by pleading guilty, he was waiving the right to later claim that his plea was the result of promises or threats that he failed to disclose to the court or to later claim that it was not his choice to plead guilty. (*Id.* at 9-10.) Petitioner confirmed that he was pleading guilty without a sentence agreement, that he had not been promised anything in return for his plea, and that his plea was not the result of threats or coercion. (*Id.* at 10-11.) Thereafter, Petitioner provided a factual basis for his plea. Petitioner testified, "I was drinking with my brother and I hit her with a floor jack, thought she'd be better off gone." (*Id.* at 11.) Petitioner admitted to choking and hitting the victim with his fists before he hit her in the head with the jack. (*Id.* at 12-13.) With regard to his intent, Petitioner stated, "Yes, I think I - I do believe I was trying to kill her." (*Id.* at 15.)

At the sentencing hearing held on May 18, 2009, defense counsel objected to the scoring of Offense Variables (OVs) 3, 5 and 7. (Sentencing Transcript, (S. Tr.) 5-10, docket #13.) The trial court agreed with defense counsel concerning OV 5 and changed the score from 15 points to 0 points, but declined to alter the scoring of OVs 3 and 7. (*Id.*) The 15-point reduction for OV 5 did not change the guideline range, which the trial court calculated to be 171 to 285 months. (*Id.* at 11.) While the probation department recommended a sentence toward the bottom of the guideline range, the prosecutor urged the court to sentence Petitioner to the middle or upper end of the range.

- 4 -

(*Id*. at 14-15, 17.)  Defense counsel asked for leniency for his client and Petitioner apologized to the victim and her family.  (*Id*. at 16.)  The trial court sentenced Petitioner to imprisonment of 16 (192 months) to 30 years.  (*Id*. at 18-19.)

Petitioner filed a motion to withdraw his plea and for a *Ginther* hearing, and a motion for resentencing.  In his motion to withdraw the plea, Petitioner claimed that his trial counsel was ineffective for misadvising Petitioner regarding the length of the sentence he would receive after pleading guilty and erroneously telling Petitioner that the related criminal case involving his brother would be dismissed if he pleaded guilty in this case.  Petitioner sought resentencing on the ground that the trial court improperly scored OVs 3, 6 and 7, which resulted in a substantially longer sentence.  Following a hearing on January 4, 2010, the trial court denied Petitioner's motion for resentencing, but agreed to hold a *Ginther* hearing at a later date with regard to Petitioner's claim of ineffective assistance of counsel.  (1/4/10 Motion Hearing Transcript 25, docket #14.)

A *Ginther* hearing was held on April 21, May 10 and June 14, 2010.  Petitioner's trial counsel, Edwin Hettinger, testified that he spoke to Petitioner numerous times regarding the subsequent criminal case involving Petitioner's brother.  (4/21/2010 *Ginther* Hearing Transcript (*Ginther* Hr'g Tr. I.) 8, docket #15.)  Hettinger also spoke to Petitioner's mother and girlfriend about those charges "many times."  (*Id*. at 9.)  Petitioner was charged in that case with first-degree home invasion, assault with intent to murder and two counts of possession of a firearm during the commission of a felony.  (*Id*. at 10.)  Hettinger testified that he went over the sentencing guidelines with Petitioner with regard to the charges in this case and explained that the trial court would set a range with a low number and a high number.  (*Id*. at 12-13.)  According to his calculation, Hettinger believed the low range would be 81 to 135 months or 6.75 to 11.25 years.  (*Id*. at 13, 20, 26, 33.)

- 5 -

Petitioner seemed to focus on 6 years as a minimum sentence, but Hettinger reminded him that 6 years was at the low end of the range that Hettinger calculated and that the trial court's range could be different. (*Id*. at 20, 21, 34.) Early on in their discussions, Hettinger told Petitioner that the guideline range was only a suggestion to the court, so the court could depart upward or downward from the guidelines. (*Id*. at 14.) Hettinger recalled having conversations with Petitioner's mother and girlfriend about his potential sentence. (*Id*. at 26-27.) He explained to them that the guideline range applied to the minimum sentence and that there also would be a maximum sentence, but he did not believe much of that was understood. (*Id*. at 26-27, 36-37.) Hettinger did not promise Petitioner or his family that he would receive any specific sentence. (*Id.* at 27, 36.)

Mr. Hettinger further testified that he told Petitioner before he pleaded guilty in this case that the prosecutor believed he had a good case and refused to offer anything to Petitioner in exchange for his plea. (*Ginther* Hr'g Tr. I, 17-18.) In addition, Hettinger informed Petitioner that he attempted to negotiate the dismissal of the second case in exchange for a plea in this case, but that proposal was squarely rejected by the prosecutor. (*Id*. at 18, 35.) Hettinger did not calculate the guideline ranges for the subsequent offenses, but suggested to Petitioner that they would be "bad," and that the sentence in the subsequent case would likely be imposed consecutive to the sentence in this case. (*Id*. at 14.) Hettinger believed that Petitioner was more likely to get leniency in the second case if he pleaded guilty in this case and advised Petitioner accordingly. (*Id*. at 18-19.) Hettinger never told Petitioner's mother and girlfriend that the second case would be dismissed if Petitioner pleaded guilty in this case. (*Id*. at 35-36.) According to Hettinger, Petitioner received the benefit of his advice when he pleaded guilty in the second case to assault with intent to commit great bodily harm less than murder. (*Id*. at 19, 22-23.) The remaining charges were dismissed and Petitioner was given a concurrent sentence. (*Id*.)

Before the sentencing hearing in this case, Mr. Hettinger informed Petitioner that the probation office had scored two offense variables higher than Mr. Hettinger believed was correct and that he was going to make objections at the sentencing hearing.  (*Ginther* Hr'g Tr. I, 25.)  Hettinger was successful in getting the court to change the scoring of one of the offense variables, but that did not change the guideline range.  (*Id.*)

Michelle Smith testified that she had dated Petitioner for five years.  (*Ginther* Hr'g Tr. I, 38.)  Smith testified that Mr. Hettinger told her that she had to convince Petitioner to plead guilty because the other case against him would be dismissed and the maximum sentence would be 6 to 11 years.  (*Id.* at 39, 42, 47.)  According to Smith, Mr. Hettinger did not explain that the trial court could sentence Petitioner to more than 11 years, although she knew at the beginning of the case that the maximum sentence Petitioner faced was much longer than 11 years.  (*Id.* at 41.)  Mr. Hettinger told Smith that Petitioner was getting a good deal in this case because the charges in the second case, which would be dismissed, included felony-firearm charges that carried a mandatory four-year term.  (*Id.* at 42-43.)  Smith testified that she and Petitioner's family confronted Mr. Hettinger when they realized that the charges in the second case were not dismissed as a result of Petitioner's plea in this case.  (*Id.* at 48.)  Smith admitted that she also encouraged Petitioner to plead guilty in the second case because the concurrent sentence was a "good deal," although they expected Petitioner to appeal in both cases. (*Id.* at 47-48, 50.)

Jean Chapman, Petitioner's mother, testified that Mr. Hettinger believed that the only way the prosecutor would dismiss the second case was if Petitioner pleaded guilty in this case.  (*Ginther* Hr'g Tr. I, 54.)  Mr. Hettinger told her that if Petitioner pleaded guilty in this case, he would "try" to get the charges dismissed in the second case.  (*Ginther* Hr'g Tr. I, 54, 57.)  Mrs. Chapman

admitted, "There was no promise that it would be dismissed." (*Id.* at 57.) Mr. Hettinger initially told Mrs. Chapman that Petitioner would be sentenced to 3 to 6 years, but after Petitioner committed the second offense, Mr. Hettinger changed the sentencing range to 6 to 11 years. (*Id.* at 54-55.) Based upon Mr. Hettinger's advice, Mrs. Chapman told her son that he had to plead guilty in this case "or the second trial would become a reality." (*Id.* at 56.)

Petitioner testified that, before he entered his plea in this case, he told Mr. Hettinger that he did not attempt or intend to kill Laurie Fisher. (5/10/10 *Ginther* Hearing Transcript (*Ginther* Hr'g Tr. II) 5, docket #16.) Petitioner told counsel that while Fisher testified at the preliminary examination that she went directly to the hospital after the alleged assault, the police report showed that she did not go the hospital until about five hours later. (*Id*. at 6.) Petitioner also believed that his brother may have inflicted some of the injuries sustained by Fisher because "she was not hurt like that" when he left. (*Id*.) With regard to the plea deal, Petitioner testified that Mr. Hettinger told him that if he pleaded guilty in this case, the second case would be dismissed. Hettinger advised Petitioner that he faced a sentence of 40 to 60 years in the second case, but would receive a sentence of only 6 to 11 years in this case if he accepted the plea. (*Id*. at 7.) Petitioner did not think he had to bring up the promise regarding the second case during the plea hearing; he thought if he pleaded guilty it would be taken care of. (*Id*. at 8.) Throughout the plea hearing, Petitioner looked over at counsel for reassurance before answering the trial court's questions because he did not know what he was doing. (*Id*. at 9, 17-18.) Petitioner testified that he would not have pleaded guilty in this case if not for the promise by his attorney that the second case would be dismissed. (*Id*. at 10-11.) Mr. Hettinger tried to explain to Petitioner how the sentencing guidelines were scored, but Petitioner did not understand. (*Id*. at 11-12.) However, Petitioner testified that he understood from Mr. Hettinger that the trial court could give him a higher sentence than what Hettinger had calculated. (*Id*. at 12-

14.)  On cross-examination, Petitioner admitted that he had pleaded guilty to past drunk driving offenses, but had not been in court for 15 years.  (*Id.* at 14-15.)  While Petitioner was offered the opportunity to speak at the sentencing hearing, he claimed that he did not mention the promise to dismiss the second case or the length of his sentence because his attorney told him that there was "no use" in raising those issues before the court.  (*Id*. at 19-20.)

Based upon the evidence presented at the *Ginther* hearing, as well as testimony presented at the plea and sentencing hearings, the trial court concluded that trial counsel had not rendered deficient performance in advising Petitioner with regard to his plea.  (6/14/10 *Ginther* Hearing Transcript (*Ginther* Hr'g Tr. III) 26-37, docket #17; 7/26/10 Orders of the Calhoun County Circuit Court, docket ##21-22.)  In reaching its decision, the court credited Mr. Hettinger's testimony that he told Petitioner that the judge would make the final determination with regard to Petitioner's sentence, that Hettinger had not promised Petitioner that the second case would be dismissed in exchange for the plea, and that Petitioner benefitted from his plea in this case by getting a favorable plea deal in the second case.  (*Id.* 27-28.)  The court relied heavily upon Petitioner's sworn testimony at the plea hearing that his plea was not the result of undisclosed promises or threats, as well as Petitioner's failure to raise these issues at the sentencing hearing when he had the opportunity to address the court.  (*Id*. at 34-36.)  The court also relied upon Petitioner's testimony at the *Ginther* hearing that Mr. Hettinger told him that the judge could give him a higher sentence than what Hettinger had calculated.  (*Id*. at 33.)  In addition, the Court cited Mrs. Chapman's testimony that Mr. Hettinger told her that he would "try" to get the second case dismissed, but there was no promise that the second case would be dismissed.  (*Id*. at 30-31.)  In light of its findings, the trial court denied Petitioner's motion to withdraw his plea.

## B.    Direct Appeal

Petitioner sought leave to appeal in the Michigan Court of Appeals.  His brief, which was filed by counsel on August 18, 2010, raised the following claims of error:

I.    Whether the Circuit Court erred in denying Defendant's Motion to Withdraw Plea where trial counsel was ineffective in failing in failing to provide adequate advice on possible sentencing upon a guilty plea and erroneously told Defendant-Appellant that the companion case would be dismissed if he pled guilty to the charge.

II.   Whether the Circuit Court erred in denying Defendant's Motion for Resentencing where the sentencing court improperly scored offense variable 3, 6, and 7 resulting in a substantially longer guideline range and subsequent sentence?

(*See* Def.-Appellant's Br. on Appeal, docket #18.)   The Michigan Court of Appeals denied Petitioner's application for leave to appeal for lack of merit in the grounds presented.  (*See* 12/13/10 Mich. Ct. App. Ord., docket #18.)

Petitioner subsequently sought leave to appeal to the Michigan Supreme Court, raising the same two claims raised before and rejected by the Michigan Court of Appeals.  By order entered May 24, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (See Mich. Ord., docket #19.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v, Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694

- 11 -

(citing *Williams*, 529 U.S. at 405-06).   The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.   Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.   "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).   The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.   Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be

overcome); *see also Harrington*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### Discussion

In order to find a constitutionally valid guilty plea, several requirements must be met. The defendant pleading guilty must be competent, *see Brady v. United States*, 397 U.S. 742, 756 (1970), and must have notice of the nature of the charges against him, *see Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976); *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). The plea must be entered "voluntarily," i.e., not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of state- induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void."). The defendant must also understand the consequences of his plea, including the nature of the constitutional protection he is

- 13 -

waiving.  *Henderson*, 426 U.S. at 645 n.13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.") (internal quotations and citation omitted).  Finally, the defendant must have available the advice of competent counsel.  *Tollett v. Henderson*, 411 U.S. 258, 267-68 (1973); *Brady*, 397 U.S. at 756; *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970).  The advice of competent counsel exists as a safeguard to ensure that pleas are voluntarily and intelligently made.  *Cf. Henderson*, 426 U.S. at 647 ("[I]t may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit."); *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel).

In this case, Petitioner contends that his trial counsel was constitutionally ineffective when he gave Petitioner material misinformation regarding the length of the sentence that he faced in this case.  Specifically, Petitioner contends that trial counsel scored the guidelines at 81 to 135 months or 6.75 to 11.25 years, while the trial court scored them at 171 to 285 months or 14.25 to 23.75, which was more than double what counsel had calculated.  Petitioner also believed from what Mr. Hettinger had told him that his maximum sentence would not exceed 11 years.  Petitioner ultimately received a sentence of 16 to 30 years.  Petitioner further claims that counsel told him that the charges in the second case involving Petitioner's brother would be dismissed if he pleaded guilty in this case.  Petitioner maintains that he would not have pleaded guilty but for counsel's representations regarding the length of his sentence and the dismissal of the second case.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Regarding the first prong, the court applies the same standard articulated in *Strickland* for determining whether counsel's performance fell below an objective standard of reasonableness. *Id.* In analyzing the prejudice prong, the focus is on whether counsel's constitutionally deficient performance affected the outcome of the plea process. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would

have insisted on going to trial." *Id*. at 59.  When a state prisoner asks a federal court to set aside a conviction due to ineffective assistance of counsel during the plea bargaining stage, a federal court is required to utilize a "'doubly deferential' " standard of review "that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (applying doubly deferential ineffective assistance of counsel standard to a new attorney's recommendation to withdraw a guilty plea, despite the attorney's not having consulted with the prior attorney or consulted the record prior to making the recommendation).

Applying the "doubly deferential" AEDPA standard, the trial court's conclusion that defense counsel's performance was constitutionally sufficient was entirely reasonable.  At the plea hearing, Petitioner stated under oath that he understood the charge against him and that it was punishable by a maximum sentence of any number of years up to life imprisonment.  (Plea Tr. 7.) Petitioner further agreed that by pleading  guilty, he was waiving the right to later claim that his plea was the result of promises or threats that he failed to disclose to the court or to later claim that it was not his choice to plead guilty.  (Plea Tr. 9-10.)  Petitioner confirmed that he was pleading guilty without a sentence agreement, that he had not been promised anything in return for his plea, and that his plea was not the result of threats or coercion. (Plea Tr. 10-11.)  "Where the court has scrupulously followed the required procedure, the defendant is bound by his statements in response to the court's inquiry." *United States v. Todaro*, 982 F.2d 1025, 1030 (6th Cir. 1993); *see also Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986); *Warner v. United States*, 975 F.2d 1207, 1210 (6th Cir. 1992).

The decision of the trial court was further supported by the testimony at the *Ginther* hearing.  Mr. Hettinger testified that he did not promise Petitioner or his family that Petitioner would

receive any specific sentence. (*Id.* at 27, 36.) Hettinger testified that he went over the sentencing guidelines in this case with Petitioner and explained that the trial court would set a range with a low number and a high number. (*Ginther* Hr'g Tr. I, 12-13.) Hettinger believed the range for the low number would be 81 to 135 months or 6.75 to 11.25 years, but told Petitioner that the guideline range was only a suggestion to the court, so the court could depart upward or downward from the guidelines. (*Id*. at 13-14, 20-21, 26, 33-34.) Petitioner testified that Mr. Hettinger tried to explain how the sentencing guidelines were scored, but Petitioner did not understand. (*Ginther* Hr'g Tr. II at 11-12.) According to Petitioner, Mr. Hettinger advised him that he would receive a maximum sentence of 6 to 11 years in this case if he pleaded guilty. (*Id*. at 7.) However, Petitioner admitted that he understood from Mr. Hettinger that the trial court could give him a higher sentence than what Hettinger had calculated. (*Id*. at 12-14.) The trial court, which was in the best position to assess the credibility of the witnesses, credited Mr. Hettinger's testimony and found that Petitioner was aware that the trial court could impose a sentence that was greater than that calculated by defense counsel. These factual findings are presumed correct, and may be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Moore v. Haviland*, 531 F.3d 393, 401 (6th Cir. 2008).

Moreover, Mr. Hettinger's calculation of the guideline range was only a good-faith estimate. Petitioner has not demonstrated that counsel engaged in any misconduct with respect to his calculation of the sentencing guidelines range. In denying Petitioner's motion to withdraw the Plea, the trial court noted the difficulty of estimating the sentencing guideline range, as well as Mr. Hettinger's efforts to change the scoring of certain offense variables at the sentencing hearing. (*Ginther* Hr'g Tr. III, 36-37, docket #17.) Counsel was successful in getting the court to lower the score with regard to one of those variables by 15 points, although that change was not enough to

- 17 -

reduce the guideline range as calculated by the trial court.  A "mere inaccurate prediction, standing alone, [does] not constitute ineffective assistance." *United States v. Arvanitis*, 902 F.2d 489, 494 (7th Cir. 1990) (internal quotation marks omitted). *See generally*, *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) ("[m]isinformation from a defendant's attorney, such as an incorrect estimate of the offense severity rating, standing alone, does not constitute ineffective assistance of counsel). Based on these facts, Petitioner has not met his burden of demonstrating that counsel was deficient and rendered ineffective assistance.

      The record from the *Ginther* hearing also supported the trial court's finding that counsel did not render deficient performance by making a false promise to Petitioner that his second case would be dismissed if he pleaded guilty in this case.  Mr. Hettinger testified that he told Petitioner before he pleaded guilty that the prosecutor believed he had a good case and refused to offer anything to Petitioner in exchange for his plea in this case.  (*Ginther* Hr'g Tr. I, 17-18.) Hettinger specifically informed Petitioner that he attempted to negotiate the dismissal of the second case in exchange for a plea in this case, but that proposal was squarely rejected by the prosecutor. (*Id*. at 18, 35.)  Nevertheless, Hettinger believed that Petitioner was more likely to get leniency in the second case if he pleaded guilty in this case and advised Petitioner accordingly.  (*Id*. at 18-19.) Mr. Hettinger also testified that he spoke to Petitioner's family "many times" regarding the charges in the second case, but never told Petitioner's mother and girlfriend that the second case would be dismissed if Petitioner pleaded guilty in this case.  (*Id*. at 8, 35-36.)  Petitioner's mother similarly testified that Mr. Hettinger told her that he would "try" to get the second case dismissed but, "There was no promise that it would be dismissed."  (*Id.* at 57.)  Again, this Court must defer to the trial

court with regard to issues of conflicting testimony and the credibility of witnesses, and Petitioner has presented no clear and convincing evidence to rebut this determination.

      Even if counsel's performance fell below an objective standard of reasonableness, Petitioner cannot show prejudice.  In order to satisfy the prejudice requirement for an ineffective assistance of counsel claim in the context of a guilty plea, the defendant must show that there is a reasonable probability that, but for counsel's errors, he or she would not have pleaded guilty, but would have insisted on going to trial.  *Hill*, 474 U.S. at 58–59.  The Sixth Circuit has interpreted *Hill* to require a federal habeas court to always analyze the substance of the habeas petitioner's underlying claim or defense to determine whether but for counsel's error, the petitioner would likely have gone to trial instead of pleading guilty.  *See Maples v. Stegall*, 340 F.3d 433, 440 (6th Cir. 2003).  Petitioner cannot make that showing merely by claiming that he would have gone to trial then if he had gotten different advice.  *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012); *see also Garrison v. Elo*, 156 F. Supp. 2d 815, 829 (E.D. Mich. 2001).  The test of whether a defendant would have not pleaded guilty if he or she had received different advice from counsel "is objective, not subjective; and thus, 'to obtain relief on this type of claim, a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.'"  *Pilla*, 668 F.3d at 373 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

      Petitioner has failed to show a reasonable probability that he could have prevailed had he insisted on going to trial, or that he would have received a lesser sentence than he did by pleading guilty.  The prosecutor had a very strong case against Petitioner, as evidenced by the preliminary examination testimony.  He has failed to allege or show that he has any viable defense to the charge. Petitioner, therefore, almost certainly would have been convicted of the charged offense and the trial

court would have calculated the same guideline range.   After his plea, the trial court imposed a minimum sentence of 16 years, which was near the bottom of the guideline range of 14 to 24 years. Had Petitioner denied guilt and gone to trial, the trial court would very likely have imposed a higher minimum sentence.   More importantly, by pleading guilty in this case, Petitioner was more likely to get a favorable plea deal in the second case.   Petitioner was charged in that case with first-degree home invasion, assault with intent to murder and two counts of possession of a firearm during the commission of a felony.   Because Petitioner was out on bond for the charge in this case when he committed those offenses, he faced the possibility of a consecutive sentence.  *See* Mich. Comp. Laws §768.7b(2)(a).   Petitioner pleaded guilty in the second case only to a reduced charge of assault with intent to commit great bodily harm less than murder.   (*Id*. at 19, 22-23.)   The remaining charges were dismissed and Petitioner was given a concurrent sentence rather than a consecutive sentence.   (*Id*.) Under the circumstances, this Court cannot find that the decision to reject the plea bargain would have been rational.   Petitioner, therefore, cannot show that he was prejudiced by counsel's performance.

### Conclusion

In light of the foregoing, the Court will deny the petition because it fails to raise a meritorious federal claim.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.   A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).   The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.

*Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


Dated: May 6, 2015                              /s/ Robert Holmes Bell
                                                ROBERT HOLMES BELL
                                                UNITED STATES DISTRICT JUDGE